## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mayo Clinic, | ) |
| | ) |
| | ) Case No.: 17-cv-4181 (PJS/BRT) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Chantelle Zack, | ) **PLAINTIFF'S SECOND** |
| ELAP Services, LLC, | ) **AMENDED COMPLAINT** |
| Group & Pension Administrators, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, pursuant to the Court's Order, hereby submits its following Second Amended Complaint, for its claims against the above-named Defendants, and complains and alleges as follows:

### PARTIES

1.     Plaintiff, Mayo Clinic ("Mayo"), is a non-profit corporation organized under Minnesota Statutes Chapter 317A and provides medical, surgical, hospital, sickness, and other health related services to individuals in the State of Minnesota.

2.     Defendant, Chantelle Zack ("Zack"), is a citizen of Iowa with a residential address of 602 East Jefferson Street, New Hampton, IA 50659.

3.     Defendant ELAP Services, LLC ("ELAP"), is a Delaware registered limited liability company with a principal place of business located at 1550 Liberty Ridge Drive, Chesterbrook, PA 19087.

1

4.     Defendant Group & Pension Administrators, Inc. ("GPA"), is a Texas registered corporation with a principal place of business located at 12770 Merit Drive, Suite 200, Dallas, TX 75251.

## JURISDICTION

5.     Jurisdiction is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1332(a)(1) based upon the diversity of the parties and the amount in controversy exceeding $75,000.00.

6.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391. Mayo is domiciled in this district and the events giving rise to this claim occurred in this district.

## FACTS

### *Mayo Clinic*

7.     Mayo's mission is "to inspire hope and contribute to health and well-being by providing the best care to every patient through integrated clinical practice, education and research." Mayo's vision statement is to "provide an unparalleled experience as the most trusted partner for health care." Mayo's value statement is that "the needs of the patient come first."

8.     Mayo is widely regarded as one of the best hospitals in the country, if not the world. In the best hospitals ranking of U.S. News & World Report 2017-2018, Mayo was ranked in the top three in the country in eleven of the sixteen categories, and was ranked as the top hospital in six categories.

9.     Mayo's pricing for the health care goods and services it provides is set in its chargemaster.  A pricing committee meets once per year to set the chargemaster prices. Mayo's pricing is considered usual and customary by nearly every reputable insurance provider and Mayo is an excellent value considering the tremendous quality of health care provided.

10.    Prior to attending Mayo for a scheduled appointment, every patient has the right to receive a price estimate for the health care goods and services to be provided.

### ELAP's Business Model

11.    ELAP is a self-described health care cost reduction company that offers employers a reference based pricing solution that enables savings up to 30% on total health care spending. ELAP's mission is to "significantly reduce health care expenses for employers by recognizing a medical provider's actual cost in delivering services and to allow a fair margin above that cost."

12.    Upon information and belief, ELAP contracts with employers and Third Party Administrators ("TPA") to author and assist in organizing Employee Retirement Income Security Act ("ERISA") self-funded health insurance plans, and to use ELAP's various methods to allegedly control costs.

13.    Upon information and belief, ELAP informs its clients and members that they can obtain health care goods and services from nearly any provider, including Mayo. ELAP then, upon information and belief, calling itself the "Designated Decision Maker" ("DDM") for the ERISA self-funded health insurance plan, unilaterally decides the amount

3

to pay the health care providers for the health care goods and services provided to the plan member or beneficiary. Upon information and belief, the amount of payment is based upon ELAP's own auditing and pricing model.

14.    ELAP publicly boasted about its business model in a Washington Post Article titled *Hospital bills too high? One benefits firm has a new strategy: Don't pay* (hereafter the "Article").

15.    The Article states, with regard to ELAP, that "There is no hospital network. Employees may use almost any facility. Payments are made later based on ELAP's analysis."

16.    Upon information and belief, ELAP's pricing model directs payments of Medicare reimbursement rates plus 20%, typically a fraction of what is actually owed to the provider for the goods and services provided.

17.    ELAP uses historical Medicare cost report information as its basis for what it considers the "actual cost" of the services provided. ELAP's model seems to ignore the fact that health care providers are required by law to accept Medicare pricing paid on behalf of Medicare beneficiaries, and receive an immense volume of Medicare patients and guaranteed payment from the Federal Government. ELAP seems to unfairly expect all health care providers to "break even" (or take a loss, in many instances) for the health care goods and services provided to patients who are Plan members or beneficiaries where ELAP is Plan author, seller and DDM.

18.    ELAP arranges payment in this manner with, upon information and belief, the knowledge that the patient and plan member or beneficiary has signed an agreement with the health care provider that guarantees payment by that patient, plan member or beneficiary of all charges not paid for by his or her health insurance plan; thereby knowingly leaving patients, plan members and beneficiaries with almost certainly large, unexpected patient obligations due to the health care provider for the health care goods and services they have received.

19.    ELAP intentionally uses the patients, plan members and beneficiaries as, upon information and belief, unknowing participants in their business model.

20.    When an underpayment is received by the health care provider based upon ELAP's reimbursement model as described above, the provider is left with no choice but to pursue the patient for the outstanding balanced due, as is the case here.

21.    ELAP then, as the DDM, retains counsel, pays for, and directs the defense of any legal claims pursued against the patient by the health care provider, contracting with national law firms such as Lewis Brisbois Bisgaard & Smith, LLP and FisherBroyles, LLP.

22.    Attorneys for these firms assure the health care provider and its attorneys that their client is the patient, plan member or beneficiary, and when deemed appropriate, force the patients and providers into protracted litigation proceedings to recover the remaining balance due for the health care goods and services provided.

23.    The interests of ELAP may be directly adverse to the interests of the patients in many of these scenarios. Upon information and belief, ELAP assures plan members or

beneficiaries that they are indemnified and won't have to pay for any outstanding balance owed to the health care provider due to ELAP's indemnity (despite the fact that the patient signed a contract with the provider agreeing to pay all amounts not paid by their respective plans), but ELAP fails to disclose that the patient, plan member or beneficiary will be subject to collection activity, negative credit reporting, and participating in the extensive demands of litigation when a suit is brought.

24.     Upon information and belief, ELAP intentionally directs employers, plan members, beneficiaries and administrators to not pay the amount providers demand and are rightly owed for the health care services provided.

25.     The Article states that "when hospitals send invoices with jaw-dropping charges, ELAP tells its clients (generally medium-sized employers) to just say no."

26.     Upon information and belief, ELAP seeks to take advantage of the cost and payment model of health care in the United States for its own financial gain, often at the expense of individual patients or non-profit health care providers such as Mayo.

27.     While ELAP describes itself as using a "reference based pricing" model, this is simply a misstatement. Reference pricing typically involves up-front negotiations with providers to come up with an explicit price for certain procedures as a way to provide insureds with an opportunity to make an informed decision regarding where to receive medical care based on potential out of pocket expenses.

28.     ELAP, on the other hand, claims to be "moving towards transparency" in the healthcare industry, but conceals itself, hiding its role as the DDM for ERISA plans, while

encouraging plan members and beneficiaries to intentionally breach the contracts they have signed with providers.

29.    Rather than initially negotiating with providers, ELAP's model is inherently dishonest; ELAP waits until Plan members or beneficiaries retain the benefits of the goods and services provided and then, after-the-fact, it causes severe underpayment to providers and ultimately it claims that the prices charged for the goods and services are excessive and unreasonable.

30.    Upon information and belief, ELAP's model relies on the fact that many providers are reluctant or unwilling to pursue patients for unpaid balances and will simply accept ELAP's gross underpayments.   ELAP's CEO publicly boasted in the Article that "overwhelmingly, providers just accept the payment."

31.    Upon information and belief, GPA is complicit with and partners with ELAP in the course of its dealings and acceptance of ELAP's business model, acting as the TPA, but is directly controlled by ELAP for the ERISA plans designed by ELAP and sold to employers.

32.    Upon information and belief, ELAP derives its profits from a formula relating to purported cost savings from billed amounts, increasing its profits through non-payment to providers; actually, simply extracting large portions of what is owed to providers such as Mayo for its own profit and gain.

### *Services Provided to Patient Zack*

33.    Zack was a covered individual under a health care policy issued, upon information and belief, by ELAP to GMT Corporation ("GMT") at all times relevant to this action;

Member ID XXXX5089; Group No.: HXXXX0002. As such, Zack was, again at all times relevant to this action, a participant and beneficiary under said policy and thus "covered" under the same.

34.     Upon information and belief, the ELAP health care policy was issued by ELAP to GMT, the employer of Zack's spouse, and is a part of an ERISA based single-employer group health and welfare benefit plan ("Plan"), as outlined above.

35.     Upon information and belief, the Plan is an employer and employee self-funded Plan with ELAP acting as the DDM, and GPA acting as the TPA and agent for the Plan on claims filed against the health care policy.

36.      Upon information and belief, ELAP also acts as an administrator for the Plan, an indemnifying party for claims brought against Plan members or beneficiaries, and holds itself out as a fiduciary of the Plan.

37.     Zack sought in-patient medical services from Mayo to treat a serious medical condition that required hospitalization and other health care goods and services at various times between January 8, 2016 and July 11, 2016.

38.     GPA and ELAP, acting as the TPAs, agents and fiduciaries for GMT and the Plan, accessed MultiPlan, Inc.'s ("Multiplan") direct Network Provider Agreement with Mayo in order for ELAP, GPA and GMT to receive MultiPlan's contracted fee schedule rate with Mayo and access to Mayo's services for GPA and GMT's insured, Zack.

39.     Zack, and upon information and belief other ELAP members, have insurance cards with the MultiPlan logo imprinted on them, however; the cards contain the statement

8

"physician only" written below the MultiPlan logo indicating that the MultiPlan contract is being accessed only for physician services.  The Plan is non-contracted for the hospital charges associated with the health care goods and services provided.

40.     Pursuant to Mayo's Network Provider Agreement with MultiPlan, accessed by ELAP, GPA and GMT, Mayo agreed to provide health care goods and services to Zack in exchange for ELAP, GPA and GMT's prompt payment on the claims submitted to it by Mayo at the contracted rate of 95% of billed charges on both physician and hospital charges.

41.     If a claim is not paid in accordance with and at the rates set forth in the Network Provider Agreement, Mayo is free to pursue its billed charges, less any payment made, and may pursue any additional rights or remedies to which it is entitled under Minnesota law.

42.     As part of the process of being admitted to Mayo, Zack signed the Mayo Clinic Authorization and Service Terms form ("Authorization"), assigning to Mayo any right she possessed to have all covered expenses of the treatment provided paid for by her health insurance provider.

43.     Moreover, by signing the Authorization Zack agreed to be financially responsible for any amount due and owing for the health care goods and services provided to her that were not paid for by her health insurance provider.

44.     Mayo provided health care goods and services to Zack and submitted claims to GPA and GMT for payment under the terms of the Network Provider Agreement.

45.     GPA and GMT processed and paid only the physician component of the claims at the 95% MultiPlan contract rate; GPA and GMT processed and paid the hospital component of the claim as out-of-network and according to ELAP's reimbursement model as outlined above.

46.     Upon information and belief, Zack was informed by ELAP, either on its own or through GPA or GMT, prior to receiving health care goods and services that Mayo was an in-network provider under the Plan, or that she could receive health care goods and services from Mayo without patient liability above and beyond deductibles, copays or coinsurance.

47.     Upon information and belief, ELAP, either on its own or through GPA or GMT, knew, by its own plan and design, that the Plan was not in-network with Mayo with regard to hospital charges, and that Zack would be held liable for all such charges that were to go unpaid by the Plan.

48.      Zack was informed by Mayo prior to her July, 2014 dates of service of the likelihood of having a substantial balance that would be her personal liability based upon how her insurance processed and paid the hospital charges component of claims from earlier dates of service.

49.     Zack expressed confusion over the underpayment of her previous charges to Mayo because, apparently, she had been informed by an insurance representative or someone at GPA or GMT that it was "taken care of."  Upon information and belief, Zack was directed not to pay the outstanding balance due and owing to Mayo for the health care goods and services she received by ELAP, GPA or through other various agents or entities of the Plan.

50.     Upon information and belief, ELAP, either on its own or through other entities such as GPA, knew or should have known that allowing Zack to receive health care goods and services from Mayo would result in substantial liability being left to Zack.

51.     Upon information and belief, ELAP, either on its own or through other entities such as GPA, informed Zack that the health care goods and services provided by Mayo were covered under her insurance policy and that she need not worry about the balance.

52.     Upon information and belief, ELAP, either on its own or through direction of other entities such as GPA, knowingly and intentionally encouraged Zack to receive health care goods and services from Mayo for which ELAP, GPA, GMT and the Plan had no intention of paying on her behalf.

53.     Upon Mayo sending a letter to Zack regarding her outstanding balance, it received a correspondence from FisherBroyles, LLP, stating that it represented Zack, ceasing Mayo's communication with Zack and denying any liability for the amount owed.

54.     Upon information and belief, Zack was never afforded the opportunity to discuss pricing, discounts, payment arrangements, or financial assistance with Mayo prior to litigation of this matter.

55.     A letter dated April 7, 2017 from FisherBroyles, LLP made several false, unsubstantiated misrepresentations including that "the Plan has already paid Mayo Clinic Hospital-Rochester a fair and reasonable reimbursement for this claim" and that "charges like this are unconscionable, deceptive, discriminatory and are the reasons my client continues to dispute this bill."

56.     The statements in the April 7, 2017 communication to Mayo are misplaced, as nearly every reputable insurance carrier contracts with Mayo and accepts Mayo's pricing as usual and customary.

57.     Further, Zack was informed of her right to obtain an estimate prior to her receiving health care goods and services from Mayo and was placed on notice by Mayo prior to her July dates of service of the likelihood of a substantial balance not covered by her insurance.

58.     There remains an outstanding balance due and owing on the claims submitted to the Plan through GPA in the amount of ninety-two thousand eighty-five dollars and twenty-two cents ($92,085.22) for the health care goods and services provided to Zack by Mayo.

59.     Mayo has demanded payment from Zack under the terms and contractual obligations contained in the Authorization, but Zack has refused to pay.

60.     Defendants' refusal to pay has forced Plaintiff to retain the services of D.S. Erickson & Associates, PLLC and Plaintiff will incur attorney fee expenses and costs to recover the amount due and owing.

## CLAIM I
## BREACH OF CONTRACT

61.     Plaintiff incorporates each and every allegation contained in Paragraphs 1-60, inclusive, with the same force and effect as if fully set forth herein.

62.     Zack is in breach of contract for her failure to pay Mayo the remaining amount due and owing for the health care goods and services provided to her as agreed to under the terms of the Authorization.

63.     As a result of Zack's breach, Plaintiff has and will incur damages in an amount in excess of ninety-two thousand eighty-five dollars and twenty-two cents ($92,085.22).

## CLAIM II
## UNJUST ENRICHMENT

64.     Plaintiff incorporates each and every allegation contained in Paragraphs 1-63, inclusive, with the same force and effect as if fully set forth herein.

65.     Mayo incurred time and resource expenses in rendering health care goods and services to Zack.

66.     Zack knowingly accepted the goods and services and received value and benefit from the same.

67.     Zack's retention of the value and benefit received from Mayo, without paying Mayo, will result in Zack's unjust enrichment.

68.     Mayo is entitled to payment of the value and benefit received by Zack in an amount in excess of ninety-two thousand eighty-five dollars and twenty-two cents ($92,085.22).

## CLAIM III
## INTENTIONAL INTERFERENCE WITH CONTRACT

69.     Plaintiff incorporates each and every allegation contained in Paragraphs 1-68, inclusive, with the same force and effect as if fully set forth herein.

70.     Upon information and belief, ELAP had knowledge of the existence of a contract between Mayo and Zack in the form of the signed Authorization.

71.     Upon information and belief, GPA had knowledge of the existence of a contract between Mayo and Zack in the form of the signed Authorization.

13

72.     Upon information and belief, ELAP intentionally instructed and or caused the breach of the contract between Mayo and Zack by ordering, as the DDM of the Plan and as part of its business model, the underpayment of the claims submitted by Mayo to the Plan through GPA, and by instructing Zack not to pay the remaining amount owed to Mayo.

73.     It was written publicly in the Article that ELAP instructs clients not to pay medical bills.

74.     Upon information and belief, GPA intentionally instructed and or caused the breach of the contract between Mayo and Zack by paying the claims submitted from the Plan in accordance with ELAP's pricing models rather than the amount submitted by Mayo for the health care goods and services provided Zack.

75.     Upon information and belief, ELAP had no legal or justifiable reason for instructing and or causing the breach of the contract between Zack and Mayo.

76.     Upon information and belief, GPA had no legal or justifiable reason for instructing or causing the breach of the contract between Zack and Mayo.

77.     As a result of ELAP and GPA's intentional interference with the contract between Mayo and Zack, Plaintiff is entitled to damages in an amount in excess of ninety-two thousand eighty-five dollars and twenty-two cents ($92,085.22).

## CLAIM IV
## UNIFORM DECEPTIVE TRADE PRACTICES ACT
### Minn. Stat. § 325D.43 *et. seq.*

78.     Plaintiff incorporates each and every allegation contained in Paragraphs 1-77, inclusive, with the same force and effect as if fully set forth herein.

14

79.     It is a violation of the Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44 subd. 1(8) if a party "disparages the goods, service or business of another by false or misleading representation of fact."

80.     Upon information and belief, ELAP, either on its own or through its various agents, communicated to Zack, GPA, GMT and/or other agents and entities the following false or misleading representations of fact:

   a.   That Mayo had already been paid in full for the services provided to patient Zack;

   b.   That Mayo is seeking through the Authorization to collect excessive and unreasonable charges;

   c.   That Medicare historic data is relevant to what is rightly owed to Mayo and what Zack is required to pay under the terms of the Authorization;

   d.   That Mayo's chargemaster prices are unfairly excessive compared to the amounts typically paid for such goods and services.

81.     Upon information and belief, ELAP's communications are part of their previously described business model, which intentionally misrepresent the reasonableness of providers' charges based on a pricing model that is not reflective of the actual costs incurred to hospitals. Upon information and belief, ELAP makes these misrepresentations in an effort to profit at the expense of Plan members or beneficiaries and of providers such as Mayo.

82.     As a result of ELAP's disparaging misrepresentations, Mayo is entitled to injunctive relief in accordance with Minn. Stat. § 325D.45 subd. 1; specifically, that Mayo is entitled to an injunction that prohibits ELAP, either on its own or through its various agents, from making such false or misleading representations regarding the health care goods and services provided by Mayo; from communicating with any of its employer clients, or Plan  members or beneficiaries that they may receive health care goods and service from Mayo and not incur any patient liability above and beyond copays, coinsurance or deductibles, and; that ELAP, either on its own or through its various agents, must disclose to Mayo, prior to a plan member or beneficiary where ELAP is the DDM receiving health care goods and services from Mayo, that ELAP has a role in determining the amount paid prior to services being provided and that Mayo has the explicit right to refuse to treat any such member or beneficiary, assuming the lack of any emergency medical situation.

83.     Mayo is entitled to reasonable attorney's fees and costs pursuant to Minn. Stat. § 325D.45 subd. 2.

## CLAIM V
## FRADULENT MISREPRESENTATION

84.     Plaintiff incorporates each and every allegation contained in Paragraphs 1-83, inclusive, with the same force and effect as if fully set forth herein.

85.     Upon information and belief, ELAP and GPA have made false representations of past or existing material fact to employers and/or plan members, and to Mayo including:

a.  Upon information and belief, ELAP, GPA, or their various agents, informed Zack that Mayo is an in-network health care provider under the Plan;

b.  Upon information and belief, ELAP, GPA, or their various agents, informed Zack that she will not be personally liable for payment on the health care goods and services provided to her;

c.  Upon information and belief, ELAP, GPA, or their various agents, informed Zack prior to her July dates of service that the health care goods and services provided to her by Mayo would be covered under her insurance plan;

d.  Upon information and belief, ELAP, GPA, or their various agents, informed Zack that in the event that she was pursued in the legal process by a provider such as Mayo, that ELAP will indemnify and defend her, deliberately omitting that Zack may be held personally liable and would be subject to having a judgment entered against her and otherwise be subjected to participation in the legal process, as is the case here;

86.  Upon information and belief, ELAP knowingly made such statements in accordance with its above described business model.

87.  Upon information and belief, GPA knowingly made such statements as a partner in furthering ELAP's above described business model that allows ELAP to profit off of deficient payments to providers.

88.   Upon information and belief, ELAP made such false representations intentionally as a way to induce members, such as Zack, to pursue health care goods and services from

17

providers such as Mayo, and to induce providers such as Mayo to provide health care goods and services to Plan members or beneficiaries where ELAP is an administrator and the DDM.

89.    Upon information and belief, GPA made such false representations intentionally, as a partner of ELAP in its business model and as a way to induce members, such as Zack, to seek health care goods and services from providers such as Mayo, and to induce providers such as Mayo to provide health care goods and services to Plan members or beneficiaries where ELAP is an administrator and the DDM.

90.    Upon information and belief, ELAP's misrepresentations induced Zack to pursue health care goods and services from Mayo and induced Mayo to provide health care goods and services to Zack.

91.    Upon information and belief, GPA's misrepresentations induced Zack to pursue health care goods and services from Mayo and induced Mayo to provide health care goods and services to Zack.

92.    As a result of ELAP and GPA's fraudulent misrepresentations, Plaintiff is entitled to damages in an amount in excess of ninety-two thousand eighty-five dollars and twenty-two cents ($92,085.22).

## CLAIM VI
## NEGLIGENT MISREPRESENTATION

93.    Plaintiff incorporates each and every allegation contained in Paragraphs 1-92, inclusive, with the same force and effect as if fully set forth herein.

94.    ELAP owes a duty of reasonable care to Zack, a member under a Plan of which ELAP is an administrator, the DDM and fiduciary.

95.     GPA owes a duty of reasonable care to Zack, a member under a Plan of which GPA is the TPA.

96.    ELAP owes a duty of reasonable care to Mayo, as a health care provider that ELAP allows and encourages Plan members or beneficiaries, where ELAP is an administrator and the DDM, to access.

97.    GPA owes a duty of reasonable care to Mayo, as a health care provider that GPA allows and encourages Plan members or beneficiaries, where ELAP is an administrator and the DDM, to access.

98.    ELAP and GPA, either on their own or through various agents, have made representations of past or existing material fact to employers and/or plan members, and to Mayo, of which ELAP and GPA knew or should have been reasonably expected to know are false, including :

      a.  Upon information and belief, ELAP, GPA, or their various agents, informed Zack that Mayo is an in-network health care provider under the Plan;

      b.  Upon information and belief, ELAP, GPA, or their various agents, informed Zack that she will not be personally liable for payment on the health care goods and services provided to her;

    c.   Upon information and belief, ELAP, GPA, or their various agents, informed Zack prior to her July dates of service that the health care goods and services provided to her by Mayo would be covered under her insurance plan;

    d.   Upon information and belief, ELAP, GPA, or their various agents, informed Zack that in the event that she is pursued in the legal process by a provider such as Mayo, that ELAP will "stand in her shoes" and defend her, deliberately omitting that Zack may be held personally liable and is subject to having a judgment awarded against her;

99.   Upon information and belief, at the times these representations were made, ELAP had no reasonable basis for believing they were true.

100.   Upon information and belief, at the times these representations were made, GPA had no reasonable basis for believing they were true.

101.   Zack reasonably relied on the information provided to her by ELAP, GPA, or their various agents, in receiving health care goods and services from Mayo.

102.   Mayo reasonably relied on these representations made by ELAP, GPA, or their various agents in providing health care goods and service to Zack.  Mayo could not have reasonably foreseen that they would be underpaid for the health care goods and services provided to Zack, since ELAP makes an active effort to conceal its role as the DDM of the Plan and to conceal the fact that Mayo would only be paid a fraction of its billed charges.

103.   As a result of ELAP and GPA's negligent misrepresentations, Plaintiff is entitled to damages in an amount in excess of ninety-two thousand eighty-five dollars and twenty-two cents ($92,085.22).

## CLAIM VII
## UNLICENSED PRACTICE OF INSURANCE
### Minn. Stat. § 60A.07

104.   Plaintiff incorporates each and every allegation contained in Paragraphs 1-103, inclusive, with the same force and effect as if fully set forth herein.

105.   Under Minnesota Law, "insurance" means "any agreement whereby one party, for a consideration, undertakes to indemnify another to a specified amount against loss or damage from specified causes, or to do some act or value to the assured in case of loss or damage." Minn. Stat. § 60A.02 subd. 3(a).

106.   Furthermore, a "company" or "insurance company" means "every insurer, corporation, business trust, or association engaged in insurance as principal." Minn. Stat. § 60A.02 subd. 4.

107.   Under Minnesota Law, "no insurance company or association, or fraternal benefit society, not specifically exempted therefrom by law, shall transact the business of insurance in this state unless it shall hold a license therefor from the commissioner." Minn. Stat. § 60A.07.

108.   ELAP undertakes to indemnify its members and/or partners and is therefore an insurance company under Minnesota law.  Not only does ELAP, per its website, provide "member advocacy and defense" by "standing in the shoes" of members and beneficiaries

21

"in a balance bill situation", it was written publicly in the Article that "ELAP agrees to handle all hospitals bills for an employer and defend workers from collections in return for a percentage fee tied to total hospital charges."

109.    ELAP, either on its own or through its various agents, encourages plan members and beneficiaries to receive health care goods and services from Mayo by informing said members and beneficiaries that they have in-network access to Mayo, as such; ELAP is transacting business in the state of Minnesota.

110.    ELAP is in violation of Minnesota law for failing to apply for and receive an insurer license from the Minnesota Commissioner of Insurance.

## CLAIM VIII
## UNLICENSED PRACTICE OF INSURANCE
## Minn. Stat. §60A.23

111.    Plaintiff incorporates each and every allegation contained in Paragraphs 1-110, inclusive, with the same force and effect as if fully set forth herein.

112.    Under Minnesota law, a third-party administrator is "any vendor of risk management services… and any entity which administers, for compensation, a self-insurance or insurance plan." Minn. Stat. § 60A.23 subd. 8(1).

113.    Administering a self-insurance or insurance plan means "processing, reviewing or paying claims, establishing or operating funds and accounts, or otherwise providing necessary administrative services in connection with the operation of a self-insurance or insurance plan." Minn. Stat. § 60A.23 subd. 8(2)(a).

114. A "'vendor of risk management services' means an entity providing for compensation, actuarial, financial management, accounting, legal or other services for the purpose of designing and establishing a self-insurance or insurance plan for an employer." Minn. Stat. § 60A.23 subd. 8(2)(e).

115. Under Minnesota law, "No vendor of risk management services or entity administering a self-insurance or insurance plan may transact business in this state unless it is licensed to do so by the commissioner." Minn. Stat. § 60A.23 subd. 3.

116. ELAP, by auditing, reviewing and directing payment for claims as part of its role as DDM of the Plan, classifies as a third-party administrator and/or a vendor of risk management under Minnesota law.

117. ELAP, either on its own or through its various agents, encourages plan members and beneficiaries to receive health care goods and services from Mayo by informing said members and beneficiaries that they have in-network access to Mayo; as such, ELAP is transacting business in the state of Minnesota.

118. ELAP is in violation of Minnesota law for failing to apply for and receive a third party administrator and/or vendor of risk management license from the Minnesota Commissioner of Insurance.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that judgment be entered against Defendants:

1. For an award of damages in an amount in excess of ninety-two thousand eighty-five dollars and twenty-two cents ($92,085.22), plus any and all pre and post-judgment interest

23

(from ELAP and GPA) pursuant to Defendant Zack's breach of contract, and pursuant to Defendants ELAP and GPA's intentional interference with contract, fraudulent misrepresentation and negligent misrepresentation.

2.     For an award of reasonable attorneys' fees against ELAP and GPA pursuant to Minn. Stat. § 325D.45 subd. 2.

3.     For injunctive relief in accordance with Minn. Stat. § 325D.45 subd. 1, specifically; that Mayo is entitled to an injunction that prohibits ELAP, either on its own or through its various agents, from making such false or misleading representations regarding the health care goods and services provided by Mayo; from communicating with any of its employer clients, or Plan members or beneficiaries that they may receive health care goods and service from Mayo and not incur any patient liability above and beyond copays, coinsurance or deductibles, and; that ELAP, either on its own or through its various agents, must disclose to Mayo, prior to a Plan member or beneficiary where ELAP is the DDM receiving health care goods and services from Mayo, that ELAP has a role in determining the amount paid prior to services being provided and that Mayo has the explicit right to refuse to treat any such member or beneficiary, assuming the lack of an emergency medical situation.

4.     For a Court order requiring ELAP to become a licensed third party administrator or vendor of risk management before conducting any more business in the State of Minnesota.

5.     For a Court order requiring ELAP to become a licensed insurance company before conducting any more business in the State of Minnesota.

6.     For such other relief as the Court deems just and equitable.


Dated: May 1, 2018                        **D.S. ERICKSON & ASSOCIATES, PLLC**

                                          By /s/ Timothy J. Henkel
                                            Timothy J. Henkel (#0389403)
                                            D. Scott Erickson (#0282212)
                                            Keith A. Patton (#0398608)
                                            920 Second Avenue South, Suite 800
                                            Minneapolis, MN 55402
                                            Phone:      (612) 333-7600
                                            Facsimile:  (612) 333-7611
                                            Email:      timothy.henkel@dserickson.com
                                                        scott.erickson@dserickson.com
                                                        keith.patton@dserickson.com
                                            ATTORNEYS FOR PLAINTIFF
                                            MAYO CLINIC